## COUNTY OF TATTNALL *v.* NEWTON.

1. A bridge spanning a stream which is crossed by a public road, and constituting a portion of such road, is a "county bridge," though the work of constructing the same be done by private citizens and a portion of the materials therefor be supplied by them, when the doing of such work and the furnishing of such materials is in pursuance of an agreement between them and the proper county authorities, who, under the terms thereof, supply the remaining materials needed for the structure.   Semble, that it would be a "county bridge" though the citizens supplied all of the materials and built it with the permission of such authorities; or without such permission, where the latter, in behalf of the public, accepted the bridge and allowed it to remain in place.

2. A county wherein such a bridge has been erected under such an agreement since December 29, 1888, is liable for injuries resulting from the defective construction thereof or from a failure by the county authorities to keep the same in repair.

3. The evidence in the present case warranted the verdict.

Argued January 29,—Decided February 26, 1901.

Action for damages.   Before Judge Evans.   Tattnall superior court.   April 30, 1900.

*Garrard & Meldrim,* for plaintiff in error.
*J. P. Moore* and *J. K. Hines,* contra.

LUMPKIN, P. J.   A mule was injured by reason of a decayed plank in a bridge spanning a stream in Tattnall county and constituting a portion of a public road of the county which crossed this stream. Newton, the owner of the mule, brought an action against the county and had a recovery. The case comes to this court upon three questions, two of law and one of fact.

1. The first legal question may be thus stated: Where an ordinary in charge of the county roads agrees with the citizens of a given community, who desire the erection of a bridge over a stream at a

place crossed by a public road, that if they will furnish a portion of the needed materials and do the work, he will furnish the remaining materials; and where a bridge is actually built at such a place and under an agreement of this kind, does it become a "county bridge"? We entertain no doubt that this question should be answered in the affirmative. Section 509 of the Political Code declares: "All roads laid out for public use by an act of the General Assembly, if not otherwise provided, or by an order of the ordinary, are declared to be public roads." A bridge which constitutes a portion of a public road is necessarily a public bridge. It is in no sense a private structure. If a public bridge, and not within the limits of an incorporated municipality, it seems inevitable that it must be regarded as a county bridge. No matter how the bridge comes into being, if it does so or remains in place with the assent of the proper county authority or authorities, its character as a public concern becomes established. The law bearing upon this subject does not stop with the general provisions embraced in section 509. "The ordinaries of the several counties have authority — 1. To appoint the places for the erection of public bridges, county ferries, turnpikes and causeways, and to make suitable provision for their erection and repairs by letting them out to the lowest bidder, hiring hands, or in any other way that may be for the public good and agreeable to law." Political Code, § 602, par. 1. What broader authority for obtaining and keeping in repair public or county bridges could possibly be conferred? The ordinaries are given power to make suitable provision for erecting and repairing such bridges in two specified ways, "or in any other way that may be for the public good and agreeable to law." The method of having county bridges constructed, indicated in the statement of our present question, and which counsel in the argument referred to as the "Tattnall plan," affords an apt illustration of one of the "other" ways in which these needed public conveniences may be lawfully procured. It makes not a particle of difference whether the quantity of material supplied by the ordinary be great or small, or of much or of little value. Indeed, if he permitted citizens to build a bridge in a public highway, or even if they built one without his permission and he accepted it, either expressly or by acquiescing in its remaining in place, it would be all the same. The bridge would belong to the county, and it would be his duty to deal with it as such. "Pub-

lic bridges may be built by the public authorities at the public expense, . . or they may be built by individuals and given to the public." Elliott on Roads & Streets (2d ed.), § 28. " If an individual builds a bridge, and the public use it, and it becomes a public utility, the public authorities must repair it." 4 Am. & Eng. Enc. L. (2d ed.) 921. " Where bridges are built by individuals and are beneficial to the public, and public use is made of them, they will be deemed public. In presuming that bridges which are of benefit to the public have been accepted by the public, effect is given to the familiar principle that acceptance may be inferred from the beneficial character of the grant. . . Where the public authorities expressly adopt a bridge constructed by individuals, or where they so build roads as to evidence an adoption and make the bridge a necessary part of the highway, they will be held to have taken the bridge in charge, and it will be their duty to keep it in safe and fit condition for travel." Elliott on Roads & Streets, supra, pp. 30-32. Of course, all that is said above, or in the next division of this opinion, with reference to ordinaries applies to county commissioners, county judges, or other officials lawfully in charge of county matters.

2. The other question of law is: Can a county be held liable for injuries resulting from the defective construction of a public bridge built since December 29, 1888, upon the "plan" above indicated, or from failure to keep the same in repair? We think that this question, with respect to both construction and failure to keep in repair, should, like the other, be answered affirmatively. Upon the assumption that our first question has been correctly solved, it can not be seriously doubted that the county is liable for the consequences resulting from the improper construction of such a bridge; and, as will have been observed, the authority over "public bridges" conferred upon ordinaries by section 602 of the Political Code relates equally to "their erection and repairs." In the light of the last proviso of section 603 of the Political Code, embracing the positive declaration "that in every case the county shall be primarily liable for all injuries caused by reason of any defective bridges, whether erected by contractors or county authorities," it seems clear that the "authority" vested in ordinaries by section 602 carries with it the correlative duty of seeing to it that all county bridges are properly built and then kept in safe condition.

The comprehensive words " and defective bridges" were manifestly intended to include not only bridges defectively built, but bridges out of repair; and it was plainly the legislative purpose to make counties liable for injuries resulting from a failure on the part of the proper authorities to observe either branch of the duty above indicated. The above-mentioned proviso was introduced into our statute law by the act of December 29, 1888, "to amend section 671 of the Code of 1882," etc. Acts of 1888, p. 39. That section, as thus amended, was codified in section 603 of the Political Code. The act referred to made a broad and sweeping enlargement of the liability of counties with regard to injuries of the character now under consideration. We have examined most, if not all, of the cases in which this court dealt with the law on this subject of force before the passage of that act. Since its enactment, many of the rulings made in those cases are no longer applicable, and we are confident that we have herein laid down the law as it now stands.

3. The question of fact is: Did the evidence require a finding that the plaintiff's driver in charge of the mule at the time it was hurt could, by the exercise of ordinary diligence, have prevented the injury? The jury, upon conflicting testimony, resolved this question favorably to the plaintiff. We can not say their verdict was not sufficiently supported, or overrule the trial judge's approval of it.

*Judgment affirmed. All concurring, except Cobb, J., absent.*